**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

ELMIR S.,[1]                                    )    NO. CV 19-7502-KS
                        Plaintiff,              )
          v.                                    )    MEMORANDUM OPINION AND ORDER
                                                )
ANDREW M. SAUL, Commissioner                    )
of Social Security,                             )
                        Defendant.              )
_____       )

**INTRODUCTION**

Elmir S. ("Plaintiff") filed a Complaint on August 29, 2019, seeking review of the denial of his applications for a period of disability and disability insurance ("DI") and supplemental security income ("SSI"). On October 4, 2019, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 10, 12, 13.) On April 7, 2020, the parties filed a Joint Stipulation ("Joint Stip."). (Dkt. No. 17.) Plaintiff seeks an order reversing the Commissioner's decision and remanding for further proceedings. (Joint Stip. at 26.) The Commissioner requests that the ALJ's decision be

---

[1]      Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

affirmed or, in the alternative, remanded for further proceedings.  (*See id.* at 26-27.)  The Court has taken the matter under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

In June 2016, Plaintiff, who was born on September 12, 1987, filed applications for DI and SSI respectively.[2]  (*See* Administrative Record ("AR") 15, 147, 153.)  Plaintiff alleged disability commencing March 24, 2015 due to:  recurrent severe major depressive disorder, loss of vision in his left eye, diabetes, G.E.R.D., and numbness in his feet due to his diabetes.  (AR 149, 175.)  Plaintiff previously worked as a taxi cab starter (DOT 913.367-010).  (AR 23, 46, 176.)  The Commissioner denied Plaintiff's applications initially (AR 82-83), and Plaintiff then requested an administrative hearing (AR 91).  On July 16, 2018, Administrative Law Judge Evelyn Gunn (the "ALJ") held a hearing at which Plaintiff, who was represented by counsel, testified as did vocational expert Aida Worthington (the "VE").  (AR 30-51; *see also* AR 15 (clarifying the spelling of the VE's name).)  On October 12, 2018, the ALJ issued an unfavorable decision, denying Plaintiff's applications.  (AR 12-25.)  On July 25, 2019, the Appeals Council denied Plaintiff's request for review.  (AR 1-6.)

## SUMMARY OF ADMINISTRATIVE DECISION

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2020.  (AR 17.)  The ALJ further found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 24, 2015.  (AR 18.)  The ALJ determined that Plaintiff had the following severe impairments:  "diabetes mellitus with diabetic neuropathy, visual deficits in the left eye, and depression."  (AR 18.)  The ALJ also concluded that Plaintiff did not have an impairment or combination of

---

[2]     Plaintiff was 27 years old on the alleged onset date and was thus defined as a younger individual under agency regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).

2

impairments that met or medically equaled the severity of any impairments listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).  (AR 18.)  In reaching that conclusion, the ALJ explained her rationale for finding that Plaintiff's mental impairment did not meet or medically equal the criteria for listing 12.04.  (AR 18.)  The ALJ determined that, during the relevant period, Plaintiff had the residual functional capacity ("RFC") to perform light work[3] with the following additional limitations:

> [Plaintiff] can lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk six hours of an eight-hour workday, and sit for six hours of an eight-hour workday with appropriate breaks.  He can perform occasional pushing and pulling with the lower extremities.  He can occasionally crouch and climb.  [Plaintiff] has no left peripheral vision and cannot engage in work that requires left peripheral vision.  [Plaintiff] can understand and remember simple instructions to complete simple work-related tasks.

(AR 20-21.)

The ALJ found that Plaintiff was unable to perform his past relevant work as a taxi cab starter (DOT 913.367-010).  (AR 23.)  However, considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of Mail Clerk (DOT 209.687-026), Marker (DOT 209.587-034), and Counter Clerk (DOT 249.366-010).  (AR 24.)  Accordingly, the ALJ determined that

---

[3]     Light work involves lifting up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  SOCIAL SECURITY ADMINISTRATION, PROGRAM OPERATIONS MANUAL SYSTEM ("POMS") DI 25001.001. Light work also requires a good deal of walking or standing, or, alternatively, sitting most of the time with some pushing and pulling of arm or leg controls. *Id.*

Plaintiff had not been under a disability, as defined in the Social Security Act, from the alleged onset date through the date of her decision, October 12, 2018. (AR 24-25.)

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (internal citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); *Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in her decision "and may not affirm the ALJ on a ground upon which [s]he did not rely." *Orn*, 495 F.3d at 630; *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). The Court will not

reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error, 'the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (internal citations omitted).

## DISCUSSION

Some of the headings in the Joint Stipulation mischaracterize the nature of Plaintiff's arguments for a remand.  Nevertheless, after carefully reviewing the substance of Plaintiff's arguments, the Court discerns the following four issues in dispute:  (1) whether the ALJ properly assessed Plaintiff's visual limitations in determining Plaintiff's RFC (Joint Stip. at 3-6); (2) whether the ALJ properly considered the opinion of Plaintiff's treating psychiatrist, Dr. Matthew Pirnazar (*id.* at 8-12); (3) whether the ALJ properly considered the opinion of the psychological consultative examiner, Mehrnoosh Rezapour, Psy.D. (*id.* at 15-16); and (4) whether the ALJ properly considered Plaintiff's statements about his symptoms and limitations (*id.* at 18-21).

## I.    The Omission of Certain Visual Limitations from the RFC

### A.  Applicable Law

At step four of the sequential analysis, claimants bear the burden of showing that they can no longer perform their past relevant work. *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001).  Although the burden lies with the claimant, the ALJ must make specific findings regarding the plaintiff's residual functional capacity—that is, what he can still do despite his physical, mental, nonexertional, and other limitations. *See id.* at 845; *Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001).  In determining a claimant's RFC, an ALJ is not required to recite verbatim the opinion of a credited medical source. *Jones v. Astrue*, No. 08-08562-

MLG, 2009 WL 4110111, at *2 (C.D. Cal. Nov. 24, 2009); *see also Phillips v. Colvin*, 61 F. Supp.3d 925, 939-40 (N.D. Cal. 2014) (an assessment of moderate limitations does not have to be exactly mirrored in the RFC determination); *Little v. Comm'r of Social Sec.*, 780 F. Supp.2d 1143, 1152-54 (D. Or. 2011) (agreeing with the Commissioner that an ALJ does not necessarily reject a medical opinion simply because he does not adopt the opinion's findings verbatim.  Instead, the RFC assessment is the ALJ's translation of the medical evidence. Accordingly, the relevant inquiry for the Court is whether the ALJ's translation is supported by the medical evidence.  *See Lee v. Colvin*, 80 F. Supp.3d 1137, 1150 (D. Or. 2015) (ALJ must "capture" plaintiff's restrictions in the claimant's RFC and the hypothetical posed to the VE and, to do so, the ALJ must make findings that are consistent with the medical testimony); *Phillips v. Colvin*, 61 F. Supp.3d 925, 940 (N.D. Cal. 2014) ("relevant inquiry is whether the medical evidence supports a particular RFC finding"); *see also, e.g., Jahnsen v. Berryhill*, 265 F. Supp.3d 992, 1000 (D. Alaska 2017) (ALJ erred by translating moderation limitations in concentration, persistence, and pace into a restriction to simple work because there was no medical source opinion that supported this translation);

Notably, an ALJ must include a limitation or restriction in a claimant's RFC where "the record provides substantial evidence of such limitations." *Dupree v. Astrue*, No. CV 10-3146-JCG, 2011 WL 651886 (C.D. Cal. Feb. 10, 2011).  Where the hypothetical posed to the VE about the claimant's RFC does not include all of the claimant's limitations that are supported by substantial evidence in the record, the VE's testimony cannot constitute substantial evidence to support the ALJ's findings regarding the claimant's ability to work.  *See Taylor v. Commissioner*, 659 F.3d 1228, 1235 (9th Cir. 2011); *Palomares v. Astrue*, 887 F. Supp.2d 906, 919 (N.D. Cal. 2012); *Brinks v. Comm'r SSA*, 343 Fed. Appx. 211, 212 (9th Cir. 2009).

\\
\\
\\
\\

6

**B.  Opinion of Dr. Chiang and the ALJ's Decision**

Plaintiff contends that the ALJ erred in omitting limitations on Plaintiff's ability to use his left eye from the RFC assessment.  Specifically, on September 21, 2016, L.C. Chiang, M.D., a state agency medical consultant, reviewed Plaintiff's medical records and opined, in connection with Plaintiff's initial disability determination, that Plaintiff's left eye had limited near acuity, limited far acuity, limited depth perception, and limited field of vision.  (AR 61-62.)  Dr. Chiang added that Plaintiff had a vitrectomy in April 2015 but his left eye vision did not improve from the procedure and his current ophthalmology exam showed "his OW VA is 20/200 with best correction."  (AR 62.)  Dr. Chiang observed that Plaintiff's vision in his right eye was within normal limits.  (AR 62.)

In her decision, the ALJ observed that Plaintiff's statements about his visual limitations were reasonably consistent with the ophthalmology records from Kaiser Permanente and the results of Plaintiff's consultative ophthalmological examination.  (AR 21.)  The ALJ also noted that Dr. Chiang had found that Plaintiff was limited in left eye near and far acuity, depth perception, and field of evidence, and she stated that she gave "great weight" to this opinion.  (AR 22.)  In her RFC assessment, the ALJ ultimately stated that Plaintiff "has no left peripheral vision and cannot engage in work that requires left peripheral vision."  (AR 20.)

**C. Discussion**

Plaintiff now contends that the ALJ "ignore[d] the majority of the visual limitations suggested by Dr. Chiang" (Joint Stip. at 5) and this alleged error is not harmless because "[a]ll of the jobs the ALJ [found] Plaintiff can perform at Step Five require frequent near acuity" (Joint Stip. at 6).  In response, Defendant asserts that there is no dispute that Plaintiff has limited vision in his left eye, the question is whether there is substantial evidence to support the ALJ's translation of that limitation into vocational terms.  (Joint Stip. at 6-7.)  Defendant

7

contends that, even if the ALJ erred, the error is harmless because none of the representative occupations identified by the VE require binocular vision.  (Joint Stip. at 7.)

Plaintiff completed an Adult Function Report on July 15, 2016, in which he indicated that he is able to prepare his own meals—namely, sandwiches, eggs, cereal, and frozen meals. (AR 183.)  He also indicated that he is able to clean, do laundry, iron, and mop and performs these activities for about 30 minutes twice a week.  (AR 183.)  Plaintiff indicated that he does not need any visual assistance in performing these activities.  (*See generally* AR 183.)  He also indicated that he has the ability to shop both in-person and over the computer and has no visual difficulties performing these activities.  (AR 184.)  Finally, Plaintiff wrote that he spends time each day "writing about music," "watching TV," and communicating with others via phone and "text," all three of which require the use of eyesight, and Plaintiff again indicated no visual difficulties in performing these activities.  (AR 185.)

On August 29, 2016, Plaintiff underwent an internal medicine consultative evaluation with Dr. Seung Ha Lim, a board eligible internist. (AR 1079-82.)  Dr. Lim found that, when Plaintiff was using both eyes without glasses, Plaintiff's visual acuity was 20/30—that is, he is shortsighted and can see at 20 feet what most people can see at a distance of 30 feet.  (AR 1080.)  Dr. Lim observed that Plaintiff did not wear distance eyeglasses and was able to visually move around the office.  (AR 1082.)  Dr. Lim provided a "functional assessment" of Plaintiff, based on the evaluation, in which he assessed very specific physical limitations, such as limiting Plaintiff to walking about six hours in an eight-hour workday with breaks, and lifting and carrying 20 pounds occasionally and 10 pounds frequently, but identified no functional restrictions stemming from Plaintiff's shortsightedness except to note rather vaguely that Plaintiff "has visual limitation in left eye."  (AR 1082.)

An agency medical consultant, G. McCormack, M.D., a rheumatologist, performed a case analysis based on Plaintiff's medical records as of May 10, 2018 and observed that

8

Plaintiff had preserved vision in the right eye, which rendered the deficits in his left eye non-severe. (AR 1092.)  Dr. McCormack assessed no visual limitations.  (AR 1097.)

Finally, at the July 2018 administrative hearing, the ALJ asked Plaintiff how his vision was "affected" by his impairments, and Plaintiff responded that he is unable to see anything to his left without turning all the way around.  (AR 42.)  "I feel like I have a blind side on my left side because I can't really see 100 percent.  If I were to see something or try go see something to my left, I can't.  I have to turn all the way to see what I have to."  (AR 42.)  Plaintiff did not identify any difficulties with near acuity.  (*See generally id.*)

Having reviewed the record, both the medical evidence and Plaintiff's statements in the Adult Function Report and at the administrative hearing, the Court finds that the ALJ's translation of Plaintiff's visual limitations, and, in particular, Dr. Chiang's assessment of those limitations, is supported by substantial evidence in the record.  Plaintiff himself identified no functional restrictions due to his vision impairment beyond a lack of peripheral vision in his left eye, and although all medical sources agreed that Plaintiff's vision in his left eye was impaired, no medical source recommended functional restrictions greater than those assessed by the ALJ.  Accordingly, there is not substantial evidence in the record to support the assessment of the additional functional restrictions now sought by Plaintiff.  The ALJ's assessment of Plaintiff's visual restrictions is, therefore, AFFIRMED.

## II.    The Medical Opinions of Dr. Pirnazar and Rezapour

### A.  Applicable Law

The second and third issues in dispute concern the ALJ's evaluation of the opinions from medical sources—namely, Plaintiff's treating psychiatrist Dr. Matthew Pirnazar and the consultative examining clinical psychologist, Mehrnoosh Rezapour, Psy.D.  "The ALJ is

responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015).  In doing so, the ALJ must articulate a "substantive basis" for rejecting a medical opinion or crediting one medical opinion over another.  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *see also Marsh v. Colvin*, 792 F.3d 1170, 1172-73 (9th Cir. 2015) ("an ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them").

Generally, the opinion of a treating source is entitled to greater weight than the opinion of doctors who do not treat the claimant because treating sources are "most able to provide a detailed, longitudinal picture" of a claimant's medical impairments and bring a perspective to the medical evidence that cannot be obtained from objective medical findings alone.  *See Garrison*, 759 F.3d at 1012; *see* 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) (governing claims filed before March 27, 2017); *see also* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c) (governing claims filed on or after March 27, 2017).  Accordingly, to reject an uncontradicted opinion of a treating or examining physician, the ALJ must provide "clear and convincing reasons that are supported by substantial evidence."  *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017); *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th Cir. 2014).  Alternatively, "[i]f a treating or examining doctor's opinion *is* contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."  *Trevizo*, 871 F.3d at 675 (emphasis added).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

\\

\\

\\

\\

\\

10

**B.  The ALJ's Assessment of the Opinion of Dr. Pirnazar**

**1.   The Opinions and Treating Notes of Dr. Pirnazar**

The second issue in dispute is whether the ALJ properly considered the opinion of Plaintiff's treating psychiatrist, Dr. Matthew Pirnazar.  (Joint Stip. at 8-12.)  On November 29, 2017, Dr. Pirnazar wrote the following in a letter to the Commissioner about Plaintiff's condition:  ". . . Elmyr is totally disabled and unable to work.  He has Major Depressive D/O and Generalized anxiety disorder which prevent him from working with the public, other coworkers.  He has mood swings, and problems with mood, energy, concentration, attention, that preclude working."  (AR 1091.)  Dr. Pirnazar wrote the same letter, verbatim, on July 9, 2018.  (AR 1806.)

The medical record shows that Plaintiff received mental health treatment at Kaiser Permanente for approximately six months, from December 2015 through May 2016.  (AR 910-1073.)  In September 2016, Plaintiff underwent a consultative psychological evaluation by Mehrnoosh Rezapour, Psy.D., a clinical psychologist, and Plaintiff explained that he had stopped treatment because he had not felt that he connected with his therapist.  (AR 1087.)

At the outset of his treatment, on December 8, 2015, Plaintiff reported to a licensed clinical social worker ("LCSW") at Kaiser Permanente that, for the last six months or so, he had felt like he had "too many problems in [his] head," symptoms triggered by the onset of his medical problems and financial stress.  (AR 910.)  Plaintiff described his symptoms as including depressed mood, sadness, irritable mood, decreased interest or pleasure, excessive worry, difficulty concentrating, sleep disturbance, and, *inter alia*, feelings of panic and panic attacks.  (AR 910.)  Plaintiff reported having "random thoughts" of suicide every three to four months.  (AR 913.)  Plaintiff's mental status exam showed that Plaintiff was alert, oriented, and cooperative with normal speech and appropriate but "decreased" eye contact, and that

Plaintiff also appeared distressed with a depressed and tearful mood and constricted affect. (AR 913.)  The LCSW diagnosed Plaintiff with major depressive disorder, recurrent episode, severe (AR 914) and referred Plaintiff for an urgent appointment and evaluation by Dr. Pirnazar (AR 914-15).

Plaintiff saw Dr. Pirnazar for the first time that same day, December 8, 2015.  (AR 919.) Dr. Pirnazar described Plaintiff as depressed and "very down" but not suicidal and not experiencing suicidal, homicidal, or paranoid ideation or auditory or visual hallucinations. (AR 919.)  Dr. Pirnazar prescribed Cymbalta (duloxetine), a nerve pain medication and antidepressant, and Trazodone, a sedative and antidepressant, as well as talk therapy.  (AR 919.)

Two days later, on December 10, 2015, Plaintiff had his first individual therapy session with Julie Koshner-Levey, a Psychiatric Social Worker at Kaiser Permanente.  (AR 924.) Plaintiff reported experiencing depression, anxiety, poor sleep and appetite, panic attacks, and obsessive thoughts following the loss of his job and break up with his girlfriend.  (AR 924.) Plaintiff frequently received group and individual therapy for several months thereafter and was consistently observed to participate and appear to enjoy group activities, maintain progress, and demonstrate improvement.  (AR 929-1009.)  In late January 2016, Plaintiff reported doing much better and feeling stable.  (AR 976.)  On March 16, 2016, Plaintiff reported that he "hope[d]" to go back to work soon.  (AR 995.)  He also described himself as "improving" but "still need[ing] structure."  (AR 1000.)

Plaintiff also saw Dr. Pirnazar on January 20, 2016 and reported feeling groggy in the mornings.  (AR 971.)  Dr. Pirnazar switched Plaintiff's prescription for Trazodone to Sonata. (AR 971.)  On May 3, 2016, Plaintiff told Dr. Pirnazar that he was improving and generally doing "a lot better" but was also experiencing stress relating to two friends passing away and having a family issue.  (AR 1013.)  Dr. Pirnazar added Elavil at night and Gabapentin to

Plaintiff's medications.  (AR 1013.)  These are the only three instances of treatment by Dr. Pirnazar reflected in the medical record.

On May 31, 2016, Plaintiff went to the Kaiser Permanente emergency room complaining of anxiety and suicidal ideation.  (AR 1069.)  He stated that he was doing better up until two to three days prior when multiple stressors made him feel overwhelmed.  (AR 1069.)  He reported that he was not taking the amitriptyline (Elavil) prescribed by Dr. Pirnazar because it made him feel too sedated.  (AR 1069.)  A mental status exam indicated that Plaintiff exhibited appropriate eye contact and normal speech, an anxious and depressed mood, appropriate affect, fair insight, adequate judgment, and a logical and coherent thought process.  (AR 1073.)  A year and a half later, on November 29, 2017, Dr. Pirnazar wrote his first letter to the Commissioner stating that Plaintiff is unable to work with the public or with coworkers due to depression and anxiety disorders.  (AR 1091.)

At the administrative hearing on July 16, 2018, Plaintiff testified that he sometimes has panicky emotions and cries if he has to leave the house.  (AR 37.)  He testified that once a week he has a bad "episode."  (AR 38.)  Plaintiff testified that he sometimes has suicidal thoughts.  (AR 39.)  Plaintiff testified that he has problems concentrating when there is a lot going on in his brain.  (AR 39.) Plaintiff had previously reported on the Adult Function Report (dated July 15, 2016) that he tended to stay home rather than be out with family or friends and sometimes had problems with others because they did not understand his mental issues.  (AR 186.)  However he also indicated that he had never had difficulty getting along with authority figures and had never lost a job due to problems getting along with other people.  (AR 187.)

\\
\\
\\
\\
\\

13

### 2. The ALJ's Decision

The ALJ assessed no restrictions on Plaintiff's ability to work with the public or coworkers, limiting Plaintiff to only, *inter alia*, "understand[ing] and remember[ing] simple instructions to complete simple work-related tasks." (AR 20.) The ALJ observed that, although Plaintiff had a diagnosis of depression, "there is little evidence of a longitudinal treatment record" of depression to document its severity. (AR 22.) The ALJ found that the limited evidence of Plaintiff's mental health impairments pointed only to limitations to simple, repetitive tasks due to the reduced concentration Plaintiff experienced as a result of his depression. (AR 22.)

The ALJ acknowledged that Dr. Pirnazar had opined that Plaintiff was "totally disabled and unable to work" and, further, unable to work with the public or coworkers. (AR 23.) The ALJ discounted Dr. Pirnazar's opinion that Plaintiff was totally disabled and unable to work on the grounds that concerned an issue reserved to the Commissioner. (AR 23.) The ALJ further found that Plaintiff's treatment notes from Kaiser Permanente undermined Dr. Pirnazar's opinion because they showed Plaintiff's mental limitations to be comparatively mild and did not support the assessment of a social limitation related to depression. (AR 23.)

### 3. Discussion

Dr. Pirnazar's assessment of extreme limitations and a total inability to work conflict with the opinions of the consulting clinical psychologist and the state agency medical consultant. Accordingly, the ALJ was entitled to discount Dr. Pirnazar's for specific legitimate reasons supported by substantial evidence in the record. The ALJ met this standard.

First, the ALJ was correct that Dr. Pirnazar's opinion that Plaintiff is totally disabled and unable to work should be discounted as an opinion on an issue reserved to the

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Commissioner.  *See* 20 C.F.R §§ 404.1527(d)(1), 416.927(d)(1) (for claims filed before March 27, 2017); 20 C.F.R. §§ 404.1504, 416.904 (for claims filed on or after March 27, 2017). Second, the ALJ's conclusion that Dr. Pirnazar's opinion was inconsistent with his own treatment records and Plaintiff's mental health treatment records is a specific and legitimate reason for discounting Dr. Pirnazar's opinion and it is supported by substantial evidence in the record.

An ALJ may properly reject a treating physician's conclusions that are "conclusory and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) ("discrepancy" between treating physician's assessment and clinical notes is a clear and convincing reason for not relying on the doctor's opinion).  Here, as discussed above, the record reflects that Plaintiff had only three appointments with Dr. Pirnazar and his last one, at which Plaintiff reported that he was doing "a lot better," was a full year and a half before Dr. Pirnazar provided his November 2018 opinion.  There are similarly no mental health treatment notes from Kaiser Permanente in the last 17 months before Dr. Pirnazar's opinions, although on April 6, 2018 Plaintiff went to the hospital complaining of nausea, vomiting, and diarrhea and also mentioned that he had been more depressed and stressed lately following the death of his parents.  (AR 1602.)  All other treatment notes during this period indicate that Plaintiff demonstrated a normal mood and affect.  (*E.g.,* AR 1448  (September 9, 2017), 1727 (April 11, 2018).)  There are also no clinical notes from Kaiser Permanente indicating that Plaintiff would have particular trouble interacting with the public or coworkers.  To the contrary, the therapists running group therapy sessions consistently observed that Plaintiff was able to interact with the other participants and seemed to derive enjoyment from participating in group activity.  (*See, e.g.,* AR 929 (December 11, 2015 –Plaintiff shows slight improvement and ability to interact with others), 958 (January 13, 2016 – Plaintiff maintains progress and helps out team effort), 967 (January 14, 2016 – Plaintiff exhibited slight improvement and seemed to enjoy activity).)  Finally, Dr. Pirnazar did not reference any clinical findings in support of

his opinion—other than Plaintiff's diagnoses generally.  Accordingly, there is substantial evidence in the record that supports the ALJ's conclusion that Plaintiff's treatment history with Dr. Pirnazar and, more generally, with Kaiser Permanente was inconsistent with his assessment of extreme functional restrictions.  The ALJ's decision to discount Dr. Pirnazar's opinion is, therefore, AFFIRMED.

### C. The ALJ's Assessment of the Opinion of Dr. Rezapour

#### 1.  The Opinion of Dr. Rezapour

On September 6, 2016, clinical psychologist Mehrnoosh Rezapour, Psy.D., performed a consultative psychological evaluation of Plaintiff in connection with Plaintiff's claim for benefits.  Dr. Rezapour observed that Plaintiff was engaged and cooperative during the evaluation but also presented as withdrawn and depressed. (AR 1086.)  Plaintiff spoke with slowed speech, exhibited a depressed mood, and exhibited an affect congruent with mood. (AR 1088.)  Plaintiff also exhibited a linear and goal directed thought process and was alert and oriented with no obsessions, compulsions, paranoia, or hallucinations.  (AR 1088.) Plaintiff's insight and judgment were appropriate. (AR 1089.)  Dr. Rezapour observed that Plaintiff maintained good eye contact and established a rapport with Dr. Rezapour during the evaluation. (AR 1088.)  Dr. Rezapour similarly observed that Plaintiff had no difficulty interacting with clinic staff. (AR 1089.)

Plaintiff reported to Dr. Rezapour that his mental health difficulties began in September 2016 in connection with the onset of his physical impairments and the loss of his job. (AR 1086-87.)  Plaintiff reported that he had started seeing a therapist in December 2015 but ceased treatment because he did not feel like he connected with his therapist. (AR 1087.)

16

Plaintiff demonstrated adequate performance on concentration tasks (*i.e.*, serial sevens and serial threes and spelling 'world' forwards and backwards) and memory tasks (*i.e.*, ability to register three out of three items in zero minutes and in five minutes).  (AR 1088.)  Dr. Rezapour assessed Plaintiff with a GAF score of 64,[4] indicating only mild symptoms or mild difficulty in social, occupational, or school functioning.  (AR 1089.)

Ultimately, Dr. Rezapour opined that Plaintiff would have the following limitations: moderate difficulty maintaining composure and temperament; mild difficulties maintaining social functioning; no limitations performing simple and repetitive tasks; mild limitations performing work activities on a consistent basis; mild limitations completing a normal workweek; no limitations accepting instructions and interacting with coworkers and the public; and moderate difficulties handling the stresses and demands or changes of full time employment.  (AR 1089.)  Dr. Rezapour further opined that Plaintiff's prognosis was "good." (AR 1090.)

## 2.  The ALJ's Decision

The ALJ summarized Dr. Rezapour's opinion at step three of the sequential analysis, when she considered whether Plaintiff's impairments met or equaled a listed impairment.  (AR 19.)  However, she also stated that her RFC assessment reflected the degree of limitation she found in the mental functional analysis at step three.  (AR 19.)  The ALJ summarized Dr. Rezapour's opinion that "[Plaintiff] has moderate difficulty maintaining composure and even temperament, mild difficulties maintaining social functioning, mild difficulties focusing and maintaining attention, mild difficulties in concentration, persistence, and pace." (AR 19.)  The

---

[4]     A GAF score of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well."  *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 34 (revised 4th ed. 2000). The Commissioner has stated that the GAF scale "does not have a direct correlation to the severity requirements in [the] mental disorders listings," 65 Fed. Reg. 50764, 50764-65 (Aug. 21, 2000), and the most recent edition of the DSM "dropped" the GAF scale.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 16 (5th ed. 2012).

1    ALJ stated that she gave "great weight to this opinion because it follows a direct mental status
2    examination of [Plaintiff] and is consistent with the results of that examination." (AR 19.)  At
3    step four, in the context of making an RFC determination, the ALJ reiterated that Plaintiff's
4    consultative psychological examination showed "no evidence of hallucination, alertness and
5    orientation, a capacity to perform serial threes and sevens, good eye contact, and showed no
6    signs of distress.  He appeared withdrawn and reported self-isolating behavior and problems
7    with concentration." (AR 21-22.)

8
9            3.  Discussion
10
11          Plaintiff argues that the ALJ by assigning Dr. Rezapour's opinion "great weight" but
12   omitting from her RFC assessment Dr. Rezapour's opinion that Plaintiff has "difficulty
13   maintaining composure and even temperament." (Joint Stip. at 15.)  Plaintiff adds that, in
14   finding that Plaintiff had no limitations on his ability to interact with others, the ALJ
15   "implicitly rejected" Dr. Rezapour's opinion regarding Plaintiff's moderate difficulty
16   maintaining composure and even temperament "without explanation." (Joint Stip. at 16.)
17   Defendant responds that there is no conflict between the ALJ's findings and Dr. Rezapour's
18   opinion. (Joint Stip. at 17-18.)  The Court agrees.

19
20          The crux of Plaintiff's argument is that Dr. Rezapour's opinion that Plaintiff has
21   difficulty maintaining composure and even temperament is necessarily an opinion that
22   Plaintiff is limited in his ability to work and interact with others, a limitation that the ALJ
23   omitted from her RFC determination.  However, Dr. Rezapour expressly considered whether
24   Plaintiff's difficulty maintaining composure and an even temperament would affect his ability
25   to interact with others—and found that it did not.  Specifically, Dr. Rezapour, after identifying
26   Plaintiff's difficulties regarding composure and temperament, stated that Plaintiff would have
27   only "mild" difficulties maintaining social functioning and "no" limitations accepting
28   instructions and interacting with coworkers and the public. (AR 1089.)  Accordingly, the

18

premise of Plaintiff's argument is flawed. The ALJ assigned great weight to Dr. Rezapour's opinion and, appropriately, included no limitation on Plaintiff's ability to work with others. There is no conflict between the ALJ's RFC determination and Dr. Rezapour's opinion, and this portion of the ALJ's decision is also AFFIRMED.

### III.     Plaintiff's Statements About His Symptoms and Limitations

#### A.  Applicable Law

The fourth issue in dispute concerns the ALJ's evaluation of Plaintiff's statements about his symptoms and limitations. An ALJ must make two findings before discounting a claimant's statements regarding the severity and persistence of her symptoms. *See Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th Cir. 2014). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). "Second, if the claimant has produced that evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony regarding the severity of the claimant's symptoms" and those reasons must be supported by substantial evidence in the record. *Id.*; *see also Marsh v. Colvin*, 792 F.3d 1170, 1174 n.2 (9th Cir. 2015); *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1161 (9th Cir. 2008). The ALJ must specifically identify "what testimony is not credible and what evidence undermines the claimant's complaints." *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)); *see also Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015) (finding legal error where the ALJ "failed to identify the testimony she found not credible"); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion.").

In March 2016, the Commissioner promulgated Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, which "makes clear what [Ninth Circuit] precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms' . . . and not to delve into wide ranging scrutiny of the claimant's character and apparent truthfulness." *Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017). Under SSR 16-3p, the ALJ shall determine whether to credit a claimant's statements about his pain and limitations by referring to the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), which include: the claimant's daily activities; the factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; the claimant's treatment, other than medication, for the symptoms; any other measure that the individual uses to relieve pain or other symptoms; and, finally, "any other factors concerning an individual's functional limitations and restrictions." SSR 16-3p. However, the lack of objective medical evidence supporting a claimant's allegations cannot provide the sole basis for rejecting his statements about the severity of his symptoms and limitations. *Id.*; *see also Trevizo*, 871 F.3d at 679; 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements").

### B. Plaintiff's Statements

Plaintiff completed an Adult Function Report (AR 181-89) and Exertion Questionnaire (AR 190-92) on July 15, 2016. When asked how his illnesses or conditions limit his ability to work, Plaintiff wrote: "I have impaired vision in my left eye and also have a stomach issue that doesn't let me work because of major discomfort in my stomach. Also dealing with severe depression and anxiety attacks." (AR 181.) Plaintiff stated that during the day he "go[es] around and help[s] with chores," in addition to going to medical appointments. (AR 182.) He

wrote that he does chores—"cleaning, laundry, ironing, fixing bed, mop[p]ing"—for 30 minutes twice a week.  (AR 183.)  Elsewhere he wrote that he gets tired quickly while doing chores and starts to feel "super weak."  (AR 192.)

Plaintiff wrote that he goes outside about two to three times per week and, when going out, is able to walk as a means of travel.  (AR 184.)  He stated that he shops for 30 minutes twice a month.  (AR 184.)  He stated that his conditions affected his ability to, *inter alia*, lift, squat, bend, stand, walk, kneel, and climb stairs.  (AR 186.)  He explained that he can only lift, squat, and bend down for a "small amount of time and weight" before losing his balance. (AR 186.)  He stated that he can walk for about 10 minutes before needing to rest for "a minute or two."  (AR 186.)  Finally, when asked if he had any more information to provide, Plaintiff stated that, due to diabetic nerve damage to his feet, it is "complicated" to be on his feet "for too long."  (AR 188.)  He added that he does not walk "too much" because he gets tired quickly.  (AR 190.)  He stated that he "usually carr[ies] grocery bags not too often."  (AR 190.)

At the August 2016 consultative physical examination with Dr. Lim, Plaintiff exhibited a "slow and mildly unsteady gait complaining of numbness of lower extremities" but did not require the use of an assistive device for ambulation.  (AR 1080, 1082.)  Dr. Lim observed that, consistent with diabetic neuropathy, sensation was decreased to soft touch in both of Plaintiff's lower extremities but his range of motion was within normal limits.  (AR 1081, 1082.)

At the July 2018 administrative hearing, the ALJ asked Plaintiff why he believed he was unable to work, and Plaintiff responded "I deal with very high depression and anxiety.  I was diagnosed with it in 2016, but also I previously had lost my job because I was dealing with stomach issues, chronic IBS, and also having to deal with neuropathy.  And also my vision on my left eye."  (AR 36.)  The ALJ later asked how the neuropathy affected Plaintiff's feet and

hands, and Plaintiff answered, "in my feet, I have very limited – I can't stand up straight.  I have very bad balance issues and also with strength.  I can't put too much weight on myself because I just can't really hold the weight down or any particular thing." (AR 41-42.) Plaintiff also testified that he fractured his left ankle the previous year and still had pain that affected the way he walked.  (AR 43.)  Plaintiff testified that he could stand or walk for three to five minutes before he needed to sit.  (AR 42-43.)  He testified that he is able to lift 15-20 pounds but would not be able to consistently lift that amount over the course of three to four consecutive days.  (AR 44-45.)

The ALJ asked the VE at the hearing whether there were jobs that a person with Plaintiff's residual functional capacity could perform if that person also was unable to walk for more than three to five minutes at a time, sit for more than an hour and a half before changing position, and lift weight more than two to three days a week.  (AR 49-50.)  The VE answered in the negative.  (AR 50.)

### C. The ALJ's Decision

The ALJ determined that, although Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (AR 20.)  The ALJ explained that Plaintiff's treatment records and the results of Plaintiff's consultative examination showed that Plaintiff's diabetes was not as limiting as Plaintiff alleged.  (AR 20.)  The ALJ observed that, at the consultative examination, Plaintiff displayed a slow and mildly unsteady gait, decreased neurologic sensitivity to touch in both lower extremities, and an absence of both ankle reflexes.  (AR 21.)  The ALJ stated "[t]hese results generally comport with the severity of [Plaintiff's] impairments evidenced in records from Kaiser Permanente."  (AR 21.)  The ALJ also summarized the conclusions of the state agency physicians who reviewed Plaintiff's medical

records:  Drs. Chiang and G. McCormack opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently and stand and/or walk for six hours out of an eight-hour day.  (AR 22.)  The ALJ ultimately concluded that Plaintiff could, *inter alia*, "stand and/or walk six hours of an eight hour workday, and sit for six hours of an eight-hour workday with appropriate breaks."  (AR 19.)

### D. Discussion

Plaintiff contends that the ALJ discredited Plaintiff's statements that he can only stand or walk for three to five minutes at a time without providing an adequate rationale.  (*See* Joint Stip. at 18-19.)  Defendant responds that the ALJ provided the following clear and convincing reasons for discounting Plaintiff's statements about his inability to stand or walk for extended periods:  (1) Plaintiff's allegations were inconsistent with the objective medical evidence (citing AR 20-23); (2) Plaintiff's treatment was inconsistent with the allegations of extreme symptoms (citing AR 22); and (3) Plaintiff's symptoms were amenable to treatment when he adhered to his medication regimen (citing AR 21).  (Joint Stip. at 22.)

The Court is not persuaded that Defendant accurately characterizes the ALJ's reasoning.  The ALJ did not indicate that Plaintiff's treatment was inconsistent with the allegations of diabetic neuropathy affecting his feet and legs.  To the contrary, as Defendant concedes in the Joint Stipulation, the ALJ's finding that Plaintiff's treatment was inconsistent with his allegations was made in the context of Plaintiff's allegations regarding his mental health condition—not his physical ailments.  (*See* Joint Stip. at 24-25.)  Similarly, Defendant asserts that, in finding that Plaintiff's *diabetes* was effectively managed with insulin, the ALJ necessarily concluded that Plaintiff's diabetic neuropathy, *i.e.*, permanent nerve damage caused by his diabetes, was also effectively managed by insulin.  (*See* Joint Stip. at 25 ("[T]he ALJ found that Plaintiff's condition was effectively treated with medication.  Fort his factor, the ALJ cited to Plaintiff's diabetes mellitus, which 'has been managed by insulin.'") (citations

23

omitted).)  The Court has reviewed the ALJ's decision and there is no indication that the ALJ concluded that Plaintiff's symptoms and limitations stemming from Plaintiff's permanent nerve damage in his legs and feet was effectively controlled by his diabetes medication or any other treatment regimen.  Accordingly, this post-hoc rationalization for the ALJ's decision also fails.

Contrary to Defendant's position, the ALJ offered only a single rationale in support of her decision to discount Plaintiff's statements about the symptoms and limitations stemming from his diabetic neuropathy—namely, that Plaintiff's statements were inconsistent with the medical evidence.  However, as stated above, the lack of objective medical evidence supporting Plaintiff's allegations about his diabetic neuropathy cannot provide the sole basis for rejecting his statements about the severity of his symptoms and limitations.  SSR 16-3p; *see also Trevizo*, 871 F.3d at 679; 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements").  Furthermore, the Court cannot say that the ALJ's error in this regard was inconsequential to the ALJ's nondisability determination or that, despite the error, "the agency's path may reasonably be discerned." *Brown-Hunter*, 806 F.3d at 492.  Accordingly, the Court grants Plaintiff's request for a REMAND on this fourth and final issue:  whether the ALJ properly evaluated Plaintiff's subjective symptom complaints regarding his neuropathy in his lower limbs.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED, and this case is REMANDED to the Commissioner for further proceedings consistent with this memorandum of decision.

1

2

       IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

3

4

       LET JUDGMENT BE ENTERED ACCORDINGLY.

5

6

DATE: June 8, 2020

7

8

9

                 KAREN L. STEVENSON

           UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28